UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


ADA SOLUTIONS, INC.,                )
          Plaintiff,                )     CIVIL ACTION NO.
                                    )     12-11306-DPW
v.                                  )
                                    )
CHUCK MEADORS and CHUCK             )
MEADORS, INC.,                      )
          Defendants,               )
                                    )
Consolidated with                   )
                                    )
CHUCK MEADORS and CMI, INC.,        )
          Plaintiffs,               )     CIVL ACTION NO.
                                    )     13-10583-DPW
v.                                  )
                                    )
CONTINENTAL STRUCTURAL PLASTICS     )
INC. and ADA SOLUTIONS, INC.,       )
          Defendants.               )


MEMORANDUM & ORDER
April 6, 2015

These matters involve a dispute among three entities
involved in the production, distribution, and sale of tactile
tiles.  ADA Solutions, Inc. ("ADA") is a Massachusetts
corporation engaged in the manufacture, sales, and installation
of tactile warning devices, including detectable warning panels.
Continental Structural Plastics, Inc. ("CSP") is a Delaware
corporation based in Ohio which engages in the manufacture of
tiles for distribution.  Chuck Meadors and Chuck Meadors, Inc.

(together, "Meadors"[1]) have acted as intermediaries among producers and distributors of tactile tiles.

The three entities developed a business relationship beginning in 2005. CSP manufactured tiles and sold them to ADA. Meadors functioned as a broker between them. As described below, there has been a significant rupture in the business relationship between ADA and CSP, on one side, and Meadors, on the other. As a result, Meadors sued both ADA and CSP, while ADA asserts claims against Meadors, both in a separate action (in which Meadors has asserted counterclaims) and through counterclaims in the action Meadors brought. The parties assert breach of contractual duties along with myriad other statutory and common law claims.

## I. FACTUAL BACKGROUND

### A. *Initial Relationship Between Meadors and ADA*

Over the course of 2005, ADA entered into a business relationship with Meadors that assumed various forms. The relationship is memorialized in several agreements entered into that year and subsequently.

On June 2, 2005, after discussing a potential business relationship, ADA drafted and presented a manufacturing

---

[1] The term "Meadors" is used in this Memorandum to denote the business actions of both Chuck Meadors individually and the company, Chuck Meadors, Inc. For purposes of this Memorandum, continually distinguishing between the two is unnecessary, clumsy, and potentially confusing.

agreement to Meadors.  Under that agreement, Meadors was to

manufacture and supply to ADA tactile warning tiles conforming

to designs provided to Meadors by ADA.  The agreement prohibited

Meadors from producing or designing any competing tactile tiles

and provided that Meadors would be compensated for the

manufacture of the tiles on a per-piece basis.  The agreement

provided that "Manufacturing is scheduled to begin on or around

October 15, 2005 and will be in effect for a period of five

years from commencement of molding operations."

**B.    *The Supplier Agreements between ADA and Meadors***

Two months later, realizing it would be uneconomical for

Meadors to produce tactile tiles with ADA as a sole customer,

given the upfront costs and impossibility of realizing economies

of scale, Meadors and ADA entered into a "Supplier Agreement" on

August 23, 2005.  Under the new arrangement, Meadors agreed that

it would "supply the following services to ADA Solutions, Inc.":

> Act as ADA's agent in negotiations for
> compression molders and SMC suppliers.
>
> Daily pick up of all molded tiles.
>
> Provide quality control inspection of all molded
> parts at molder's facilities.
>
> Provide all labor required to perform all
> subassembly, packaging and preparation of tile
> for direct shipping of tile to ADA's customers.

> Provide secure storage of tile as required.
> Complete all required paperwork for direct
> shipments.

In exchange for performing these services, Meadors was to be paid a commission between $1.00 and $5.00 per tile. The agreement also provided that Meadors was "to perform quality inspection, daily pick up, packaging, direct shipping of orders and storage of the retrofit tiles at the rate of $1.50 per tile" and that Meadors would "be responsible for any and all maintenance and/or repairs required for the operation of the hole punch fixtures including the regular replacement of drill bits."

To facilitate Meadors's agency under the supplier agreement, ADA provided written authorization to Meadors to act on its behalf. That authorization stated:

> ADA Solutions, Inc., hereby authorizes Chuck Meadors
> to act as an agent on it's [sic] behalf and negotiate
> and administer supplier agreements with potential
> compression molders and SMC suppliers in the state of
> Ohio.
>
> Additional responsibilities include but are not
> limited to the following:
>
> Quality control of raw material and molded parts
> Inspection of tooling
> Inspection and auditing of molded parts
> Perform all operations of ADA's Ohio satellite
> operation

As part of the performance of these agreements, in addition to acting as a purchasing agent for ADA, Meadors provided

ancillary or secondary services to ADA.  Together with Siegfried

Horn, whom Meadors hired, Meadors developed a new sheet molding

compound formula.  This allowed the compound to be manufactured

by a designated supplier to ADA located and identified by

Meadors, rather than requiring an external supplier.  This

supplier was CSP.  In addition, Meadors assumed responsibility

for certain post-production tasks such as quality checking and

drilling tiles, which were required before delivery to ADA.

Similarly, Meadors developed another molding compound with the

assistance of James McDarment, who was hired for that purpose.

These additional services allowed CSP to produce the tactile

tiles required by ADA.

**C.   *The Sales Representative Agreement between CSP and Meadors***

On September 13, 2005, Meadors entered into a sales

representative and agent agreement with New Venture Holdings,

LLC, which was subsequently acquired by CSP.  The agreement

explained that:

> This document is provided to cover the Confidential
> Agreements between [Meadors], and New Venture
> Holdings, LLC, or Continental Structural Plastics.
>
> It is to provide that all products, projects and
> customers, including the first new business, i.e., ADA
> Solutions, Inc., will be exclusive to Chuck Meadors
> accounts.  Further, that it is understood and
> acknowledged with this agreement of commissions to be
> paid to Chuck Meadors of 5% (five percent) for all
> sales / revenues of ADA Solutions, Inc., business
> beginning on this first day of September 13, 2005, and
> for the entire life of programs including – molded

parts, commercially sold compound / SMC and/or all
future sales generating revenue.

New Venture Holdings, LLC or Continental Structural
Plastics agrees to not pursue said accounts that Chuck
Meadors has identified in writing, as with ADA
Solutions, Inc.

An attachment to the agreement identified all accounts.

On October 3, 2005, David Murtha, general manager of CSP,

sent a letter to Meadors confirming the commission agreement on

behalf of CSP.  That letter stated:

This letter is to confirm that David Murtha, General
Manager of the Connesut facility, has the authority
from Continental Structural Plastics or New Venture
Holdings LLC to ensure the life of the contract
providing product to ADA Solutions with ADA Solutions
approved custom made material (SMC) and molded product
with tools supplied by ADA Solutions.

We recognize Chuck Meadors as the acting agent for ADA
Solutions with a five percent (5%) commission fee on
all sales of molded parts and and [sic] SMC compound
commercially.

Although ADA does not dispute the existence of this

agreement, the parties' positions concerning discussions between

Meadors and ADA regarding the surrounding facts differ in one

significant way.  Meadors contends that it was authorized by ADA

to charge this commission on sales from the suppliers of tiles

to ADA and that this would be part of its compensation for

acting as ADA's agent.  During his deposition, Mr. Meadors

explained that Mr. Flaherty, president of ADA, directed him to

"negotiate . . . a five percent deal."  ADA, in contrast, claims

that the commissions received by Meadors from CSP were neither authorized by nor disclosed to ADA.

Regardless of whether ADA authorized the commissions, from October 2005 until June 2006, CSP provided tactile tiles to ADA and, during that period, paid a five percent commission on all such sales to Meadors, as set forth in the September and October 2005 agreements and letters between CSP and Meadors.

**D.    *The Trusted Supplier Agreement Between ADA and Meadors***

On April 27, 2006, ADA and Meadors entered into a "trusted supplier" agreement.  In the letter setting forth the agreement, ADA explained that it would be providing Meadors with confidential information and required that Meadors keep the information confidential, that it not use the information for purposes other than acting on behalf of ADA, and that it refrain from engaging in certain activities in competition with ADA. This agreement also contained a choice of forum clause directing litigation to Massachusetts courts.  According to ADA, Meadors did not disclose to ADA the five percent commission it was receiving from CSP when it signed this new agreement.

**E.    *The June 2006 CSP/ADA Meeting and the Agreement by Meadors to look to ADA as its Sole Payment Source***

On June 20, 2006, Dave Murtha, the plant manager at CSP's Connesut Ohio plant, and Tom Hilborn, vice president for sales of CSP, met with Mr. Flaherty, the president of ADA, and Scott

Ober, a vice president and co-owner of ADA.  Meadors was not present.  During this meeting, Mr. Flaherty and Mr. Ober were allegedly informed for the first time of the payment of a five percent commission by CSP to Meadors on all of CSP's sales to ADA.  According to those present at the meeting, CSP explained that it would be able to offer a more competitive price to ADA if CSP did not have to pay this commission, at which point Mr. Ober "almost fell off the chair" in surprise at the revelation of these payments.

Either during or shortly after the June 2006 meeting, Mr. Flaherty called Meadors with an ultimatum.  Meadors could either continue to receive the five percent commission it was receiving from CSP, or it could continue to receive the per-tile payment that it had agreed to receive from ADA.  However, Meadors would not be permitted to continue to receive payments from both ADA and CSP.

Faced with this choice, Meadors relinquished its claim to the five percent commission on CSP's sales, opting instead to receive a payment as the purchasing agent of ADA.  Since that time, Meadors has not received commissions from CSP on its sales to ADA.

**F.    *The Meadors-Zehrco Sales Representation Agreement***

On March 22, 2007, Meadors entered into a sales representative agreement with Zehrco-Giancola Composites, Inc.

8

In that agreement, Zehrco-Giancola appointed Meadors as its
sales representative.  Meadors agreed to a "commission schedule
of 5% on all new orders received and accepted by the Company."
The agreement further explained that it:

> is intended to, and does create, only the relationship
> of independent contractor, between [Meadors] and
> [Zehrco-Giancola], and does not establish between
> them, any relationship as partners, or employer and
> employee. [Meadors] shall at all times be free from
> the control of the Company, as to the time and manner
> in which it shall work and otherwise, and is free to
> represent other companies as it may deem appropriate.
> [Meadors] shall have authority hereunder or otherwise,
> to represent that it is the agent affiliated with
> [Zehrco-Giancola] as an authorized representative
> . . . .

In August 2010, this agreement was revisited.  In the
revision, the parties agreed that Meadors was owed a lump-sum
payment for past commissions of $57,814.49, and Meadors accepted
a reduction in his commission from five percent to two percent.
The parties also agreed that Meadors would continue to act as a
"Commission Only Salesman" on behalf of Zehrco-Giancola "for the
primary purpose of securing business and payments thereto for
[Zehrco-Giancola] from an unique customer, known as ADA
Solutions, Inc. . . .  Each of the parties hereto have a special
relationship with each other and with [ADA], and this agreement
makes clear the economic aspects of such relationship as it has
existed and shall exist by and between the parties regarding
[ADA]."

ADA claims that, as with the earlier agreement between Meadors and CSP, this agreement was neither authorized by nor disclosed to ADA. Meadors, however, has a different explanation for this arrangement. As Mr. Meadors states in his affidavit, his relationship with Zehrco-Giancola dates back well over a decade. He ran Zehrco Plastics, Inc. until 2003. From 2001 through 2003, he infused the company with more than $750,000 of personal savings and assets. This support, however, was insufficient to ensure the ongoing solvency and viability of the business, and so Mr. Meadors decided to sell the company to the Giancola family — forming Zehrco-Giancola Composites. At the time of the sale, Mr. Meadors was kept on in his new role — commencing June 2003 — as president of the reformed company with the promise of becoming a one-third equity owner after one year. Before the year was up, however, the Giancolas terminated him from his position, pretermitting the vesting of his equity stake.

According to Mr. Meadors, the payments referred to as commissions in the 2007 and 2010 agreements between Zehrco-Giancola and Meadors were not, in fact, commissions, but instead represent the repayment of Zehrco-Giancola's obligations arising from Meadors's equity investment in the company. According to Mr. Meadors, they were characterized as commission payments to serve Zehrco-Giancola's tax minimization purposes. Mr. Giancola

denies this and contends that they were commission payments which Meadors negotiated after arranging for Zehrco-Giancola to become a supplier to ADA.[2]

## G.   *The Jefferson, Ohio Facility Agreement*

On October 13, 2011, Meadors entered into a new agreement to act as an agent on behalf of ADA.  That agreement explained that Meadors was an agent of ADA, and that ADA desired to expand its business by acquiring a larger facility.  The agreement stated that:

3.    Whereas [ADA] desires to acquire at his sole cost
. . . a manufacturing facility located at 150
South Cucumber Street, Jefferson, Ohio 44047
(hereinafter the Property), and has agreed that
[Meadors] will occupy said facility rent-free
after acquisition, and

4.    Whereas, said facility is the subject of a
Foreclosure proceeding in Ashtabula County Common
Pleas Court case . . .

5.    Whereas, [Meadors] has contractually acquired an
Assignment of the primary mortgage holder's
rights to said property and that [ADA] has
provided the entire consideration for acquisition
of said assignment.

6.    Now Therefore it is agreed that [Meadors] will
use said assignment to acquire title to the said
property at said Sheriff's Sale and further,
should [Meadors] be successful in acquiring said
title to the property, [Meadors] will immediately
convey said title to [ADA] . . .

[2] Meadors has produced a handwritten document which, though unsigned, it claims sets out the arrangement as it was actually subsequently performed.  Mr. Giancola denies authoring or even recognizing this document.

Meadors performed this agreement, acquiring the property and then delivering it via quitclaim deed to ADA. Meadors also renovated the acquired property and moved its equipment and operations into the space beginning in January 2012.

### H. *The Termination of the Relationship Between ADA and Meadors*

Over the course of the weekend of March 16 through March 18, 2012, ADA ended its business relationship with Meadors, including locking Meadors out of the Jefferson, Ohio facility. David Chase, Mr. Flaherty's brother-in-law, assumed management of the operations in the Jefferson, Ohio facility and assumed control and possession of the equipment installed by Meadors.

According to ADA, the termination of the ADA-Meadors business relationship was occasioned by the discovery that Meadors had again entered into an arrangement (this time with Zehrco-Giancola) pursuant to which it would receive commission payments on a supplier's sales to ADA. Meadors, in contrast, claims that the reason for the termination was deceptive avarice on the part of ADA. Mr. Flaherty convinced Meadors to acquire and set-up a turn-key manufacturing operation, Meadors says, and then assumed control, locking Meadors out while Mr. Meadors was on an extended trip to Texas.

## II. PROCEDURAL BACKGROUND

### A. *The Consolidated Lawsuits*

ADA filed its initial complaint against Meadors in Massachusetts state court on June 18, 2012. Meadors removed the Massachusetts action to this court based upon federal diversity jurisdiction and then filed an answer and counterclaim against ADA, which it amended on July 31, 2012.

Three days after ADA commenced the Massachusetts action against Meadors, Meadors filed a complaint in the United States District Court for the Northern District of Ohio, naming both CSP and ADA as defendants. Meadors amended that complaint on July 31, 2012. CSP answered the complaint in the Ohio action. ADA filed a motion to dismiss or, in the alternative, to transfer the case to this court for consolidation with the Massachusetts action ADA had already commenced. Meadors, for its part, sought to transfer the Massachusetts action to the Ohio court.

On March 8, 2013, the Ohio Court denied ADA's motion to dismiss but granted its motion for transfer to this court. In light of that decision in the Ohio Court, I denied Meadors's motion to transfer the Massachusetts action and consolidated the two actions. After transfer and consolidation, ADA filed an answer and counterclaims against Meadors in the transferred Ohio action.

## B.    The Parties' Claims

Meadors asserts six identical claims against ADA in the transferred Ohio action and in its answer and counterclaim filed in this court: (1) breach of a joint venture agreement; (2) tortious interference with contract; (3) breach of contract by ADA in connection to the Jefferson, Ohio facility; (4) breach of contract by ADA in connection with services performed by Meadors; (5) unjust enrichment; and (6) promissory estoppel. Against CSP, Meadors asserts four claims in the transferred Ohio action: (1) breach of contract; (2) unjust enrichment; (3) promissory estoppel; and (4) violation of Ohio Rev. Code § 1335.11.

ADA asserts five identical claims against Meadors in the Massachusetts action and its answer and counterclaim to Meadors's transferred Ohio action: (1) breach of contract; (2) breach of fiduciary duty; (3) conversion; (4) fraud; and (5) violation of Mass. Gen. Laws ch. 93A, § 11.

## C.    The Instant Dispositive Motions

Meadors has moved for partial summary judgment against both CSP and ADA.  It seeks judgment in its favor against CSP on its claims for breach of contract and violation of Ohio Rev. Code § 1335.11, and in its favor against ADA on its claims for breach of a joint venture agreement, breach of contract in relation to services performed by Meadors, unjust enrichment, and promissory

estoppel.  For its part, CSP has moved for summary judgment in
its favor on all of the claims asserted by Meadors against it.
ADA similarly seeks summary judgment in its favor on all of its
claims against Meadors, as well as on all of the claims asserted
by Meadors against it.  After the completion of summary judgment
briefing, Meadors belatedly filed what it described as a motion
for judgment on the pleadings, pursuant to Federal Rule of Civil
Procedure 12(c), pertaining to ADA's claims against Meadors.

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 "mandates the entry of
summary judgment, after adequate time for discovery and upon
motion, against a party who fails to make a showing sufficient
to establish the existence of an element essential to that
party's case, and on which that party will bear the burden of
proof at trial."  *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322
(1986).  The question is whether, viewing the facts in the light
most favorable to the nonmoving party, there is a "genuine
dispute as to any material fact."  Fed. R. Civ. P. 56(a); *Casas
Office Machines, Inc.* v. *Mita Copystar Am., Inc.*, 42 F.3d 668,
684 (1st Cir. 1994).

Cross-motions for summary judgment do not alter the basic
summary judgment standard, but rather require courts to
determine whether either of the parties deserves judgment as a
matter of law on facts that are not disputed.  *See Adria Int'l*

*Group, Inc*. v. *Ferre Dev.*, Inc., 241 F.3d 103 (1st Cir. 2001);
*Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st
Cir. 1996).

### IV.  CHOICE OF LAW

Before addressing the substantive claims, it is necessary
to determine which state's law governs the claims presented
here.  A federal court sitting in diversity applies the choice-
of-law rules of the forum state.  *See Klaxton* v. *Stentor Elec.
Mfg. Co.*, 313 U.S. 487, 496 (1941).  When a case is transferred
to a new forum pursuant to 28 U.S.C. § 1404(a), however, the
transferee court must apply the choice of law rules of the
transferor forum.  *See Ferens* v. *John Deere Co.*, 494 U.S. 516,
523 (1990).  Here, the claims by ADA against Meadors were filed
in this court, making Massachusetts the forum state.  The claims
by Meadors against ADA and CSP, however, were filed in federal
court in Ohio and then transferred to this court, making Ohio
the forum state for those claims.

### A.  *Meadors's Claims Against CSP*

All of Meadors's claims against CSP are bottomed in
contract.  Under Ohio law, absent a contractual choice of law
provision, the rights and duties of parties under a contract
"are determined by the law of the state that has 'the most
significant relationship to the transaction and the parties.'"
*Janhour* v. *Scottsdale, Ins. Co.*, 211 F. Supp. 2d 941, 949 (S.D.

Ohio 2002); *see Ohayon* v. *Safeco Ins. Co. of Ill.*, 747 N.E.2d
206, 220 (Ohio 2001).  Among the non-exclusive factors to be
considered in making this determination are: (a) the place of
contracting; (b) the place of negotiations of the contract; (c)
the place of performance; (d) the location of the subject matter
of the contract; and (e) the domicile, residence, nationality,
place of incorporation and place of business of the parties.
*Ohayon*, 747 N.E.2d at 220.

Meadors and CSP are both residents of Ohio.  The contract
was entered into there.  The subject of the agreement relates to
the negotiation of the sale of CSP's tactile tiles, which would
be produced at CSP's facilities in Ohio.  For these reasons, I
conclude that Ohio law applies to the agreement between CSP and
Meadors.

**B.  *Meadors's Claims Against ADA and ADA's Claims Against
    Meadors***

Because the choice of law approaches employed by Ohio and
Massachusetts include consideration of the same factors for
contractual claims,[3] I consider Meadors's claims (brought

---

[3] As Judge Gorton has observed, "Massachusetts applies a
'functional' approach [to choice of law] which closely resembles
the determination laid out in the Restatement (Second) of
Conflict of Laws as to which state has the most 'significant'
relationship to the case."  *Hansen* v. *Rhode Island's Only 24
Hour Truck & Auto Plaza, Inc.*, 962 F. Supp. 2d 311, 314 (D.
Mass. 2013) (citing *Bushkin Assocs., Inc.* v. *Raytheon Co.*, 473
N.E.2d 662 (Mass. 1985)); *see Jamhour* v. *Scottsdale, Ins. Co.*,
211 F. Supp. 2d 941, 949 (S.D. Ohio 2002) (Ohio choice of law

initially in Ohio) and ADA's claims (brought initially in Massachusetts) using the same framework.

For the same reasons as discussed above regarding the agreement between Meadors and CSP, I conclude that the agreement between Meadors and ADA relating to the Jefferson, Ohio facility is subject to Ohio law. That agreement pertains entirely to real estate in Ohio and was to be performed entirely there. Accordingly, I will apply Ohio law to that contract.

The choice of law question is more complex with regard to the various supplier and ancillary service agreements between Meadors and ADA. Although the tasks required of Meadors were to be performed mainly in Ohio, delivery of the goods would be to Massachusetts, where ADA is located. In addition, the April 2006 agreement provides a choice of forum (but not of law) clause in favor of Massachusetts. *Cf. United Standard Mgmt. Corp.* v. *Mahoning Valley Solar Resources, Inc.*, 476 N.E.2d 724, 26 (Ohio Ct. App. 1984) (forum selection clauses and choice of law clauses are different types of provisions but enforceable under same restrictions). Given that it is a close call and dependent on facts that are not fully developed — and because the determination is ultimately irrelevant since the laws of Ohio and of Massachusetts are similar in relevant aspects — I do

---

approach follows §§ 187 and 188 of the Restatement (Second) of Conflicts)).

not reach a conclusive determination as to which state's law applies to the Meadors-ADA supplier contracts but rather refer to both Ohio and Massachusetts law in the discussion provided in this Memorandum.  *See Glidden Co.* v. *Lumbermens Mut. Cas. Co.*, 861 N.E.2d 109, 115 (Ohio 2006) (court need not conduct choice-of-law analysis absent actual conflict of Ohio law with law of another jurisdiction); *see also Levin* v. *Dalva Bros., Inc.*, 459 F.3d 68, 73 (1st Cir. 2006) (choice of law analysis required only where there is actual conflict of laws).

### V. MEADORS'S CLAIMS AGAINST CSP

Meadors seeks summary judgment on its claims against CSP for breach of contract and violation of Ohio Rev. Code § 1335.11, which imposes civil liability on a principal who fails to pay a commission due to a sales representative. Meadors contends that CSP violated the terms of the September 2005 agreement between them, first by approaching ADA in June 2006 regarding potential new, direct sales, and second, by not making the five percent commission payments to Meadors on all sales to ADA after the CSP meeting with ADA in June 2006.  For its part, CSP seeks summary judgment on all claims against it, including on Meadors's claims of unjust enrichment and

promissory estoppel, for which Meadors did not seek summary

judgment itself, and as to which CSP does seek summary judgment.[4]

## A. *Statute of Limitations*

A threshold issue is whether the claims asserted against

CSP are barred by the applicable statute of limitations.

CSP contends that the statute of limitations provided by

the Uniform Commercial Code ("UCC"), codified as Ohio Rev. Code

§ 1302.98 (and Mass. Gen. Laws ch. 106, § 2-725), should apply

here.  The UCC statute of limitations, as interpreted by Ohio

courts, applies only to a contract for the "sale of goods," and

is generally not applicable to a contract for the provision of

services. *See Mecanique C.N.C., Inc.* v. *Durr Envtl., Inc.*, 304

F. Supp. 2d 971, 976 (S.D. Ohio 2004) (citing Ohio appellate

decisions).  The agreement between ADA and CSP is a contract for

the rendition of services, not for the sale of goods.  The

written agreement is termed by the parties a "Sales

Representative & Agent Agreement."  Although it relates to the

sale of goods by CSP to ADA, the contract itself is one for

services: Meadors's role is to negotiate the sale of goods, for

which it is to be paid a commission.  In addition, CSP committed

---

[4] Because Meadors has effectively waived these two claims by not
presenting argument on them in opposition to CSP's motion for
summary judgment, and because the contractual dispute between
them — as to which Meadors does present argument — effectively
embodies the essence of these variations on contract claims, I
will grant summary judgment for CSP on them.

itself not to solicit business from ADA directly.  Nothing in the contract governs the sales of goods by either CSP or Meadors.  Therefore, it is not a mixed contract involving the sale of both goods and services to which the "predominant factor" test must be applied.  *See Mecanique*, 304 F. Supp. 2d at 976.  Rather, it is simply a contract for services to which the UCC does not apply.

Because, as discussed above, I conclude that Ohio law provides the rules of decision regarding the agreement between CSP and Meadors, the Ohio statute of limitations for breach of contract applies.[5]  Ohio law provides a fifteen-year statute of limitations for contractual causes of action accruing prior to 2012.  *See* Ohio Rev. Code § 2305.06.[6]  Consequently, Meadors's action against CSP is timely.

## B.   *Breach of Contract: CSP's Pursuit of Direct Sales to ADA*

The agreement between CSP and Meadors provides that:

New Venture Holdings, LLC or Continental Structural
Plastics agrees to not pursue said accounts that Chuck

---

[5] Were Massachusetts law to govern, a six-year statute of limitations would apply. *See* Mass. Gen. Laws ch. 260, § 2.
[6] The statute of limitations for a breach of contract under Ohio law is governed by Ohio Rev. Code § 2305.06.  Prior to June 2012, that statute provided a fifteen year statute of limitation.  This was amended to shorten the limitation to eight years.  The amendment, however, applies only to prospective breaches; "[S]ection 2305.06 of the Revised Code, as amended by this act, applies to actions in which the cause of action accrues on or after the effective date of this act."  S.B. 224, 129th Gen. Assemb., Reg.  Sess. (Ohio 2011).

Meadors has identified in writing, as with ADA
Solutions, Inc. . . .

In June 2006, Dave Murtha and Tom Hilborn of CSP traveled
to Massachusetts to meet with ADA.  As Mr. Murtha explained,
"the purpose of the meeting was to go to Massachusetts and meet
with ADA about soliciting new business."  In particular, CSP
sought to obtain business from ADA that was currently being
performed by Hadlock Industries, a competitor of CSP.  During
the meeting, Mr. Hilborn, of CSP, told Mr. Flaherty, of ADA,
that CSP would be able to supply ADA with products at a better
price than Hadlock if they did not have to pay a five percent
commission to Meadors.

This conduct is a direct violation of the promises made by
CSP to Meadors.  CSP agreed not to pursue business with ADA and
yet it did so.  Further, CSP sought to obtain the business by
offering to breach its agreement to pay five percent commissions
to Meadors.  Accordingly, no reasonable fact-finder could
conclude that CSP did not breach its contract with Meadors.
However, Meadors is entitled to summary judgment in its favor on
this claim only if it has not abandoned that contractual
benefit, a question I discuss below.

## C.    *Breach of Contract: CSP's Ceasing Payment of Five Percent Commission to Meadors*

The parties agree that from October 2005 until June 2006,
CSP paid Meadors commissions of five percent on sales by CSP to

ADA, as set forth in the September 2005 agreement between CSP and Meadors.[7]  During the June 2006 meeting, CSP and ADA discussed these five percent commissions.  Those parties agreed on pricing terms for the supply of goods by CSP to ADA that no longer included the five percent Meadors commission.  By ceasing payment of the five percent commission, CSP was able to sell goods to ADA at a more competitive price and thus able to obtain additional business from ADA.

Either during or after the June 2006 meeting, this new arrangement was presented to Meadors by Mr. Flaherty.  Mr. Flaherty told Meadors it could continue to receive either the commission from ADA under the August 23, 2005 supplier agreement, or the commission from CSP under the September and October 2005 sales representative agreements, but not both. Faced with this choice, Meadors chose to receive payment under the agreement with ADA, rather than with CSP.  As a result of these discussions, CSP ceased making the five percent commission payments in June 2006.

CSP offers three arguments for why it was permissible for it to cease payments.  First, CSP relies on ADA's relationship with Meadors, arguing that ADA had the authority to terminate or

---

[7] CSP appears to contend that these should be termed "rebates" rather than "commissions."  The signed agreement between CSP and Meadors, however, refers to them as "commissions"; consequently, I will use that terminology.

change the terms of Meadors's agency, including by specifically prohibiting the receipt of commissions from CSP. Second, CSP argues that Meadors effectuated a waiver of its contractual rights by choosing to receive payment from ADA rather than CSP. Third, CSP contends that the events of June 2006 constitute a novation, replacing the previous contractual arrangements with a new one.

1.  The Effect of the Agreement Between Meadors and ADA on CSP's Contractual Obligations

At the time that Meadors entered into its agreement with CSP, it was also engaged as an agent on behalf of ADA tasked with locating a supplier of tactile tiles and paid by ADA for that purpose. Meadors claims that it was authorized by ADA to obtain compensation for locating a supplier from the supplier in the form of a commission on sales, a contention ADA contests.

As Meadors's principal, ADA had the right to revoke Meadors's agency authority at any time. *See Davis & Tatera, Inc.* v. *Gray-Syracuse, Inc.*, 796 F. Supp. 1078, 1086 (S.D. Ohio 1992) ("[A]gency agreements without a definite period of time are deemed to be terminable at will." (citing 3 Ohio Jr. 3d, Agency & Independent Contractors § 22)); *see also Bailey* v. *Astra Tech, Inc.*, 999 N.E.2d 138, 145 (Mass. App. Ct. 2013). According to CSP, because ADA had the ability to terminate its agency relationship with Meadors, it necessarily also possessed

the lesser included power to modify that relationship and, with Meadors's consent, to enter into a new agreement.

The fact that ADA had a legal right to terminate Meadors as an agent, however, does not necessarily affect the agreement between Meadors and CSP.  Nothing in the agreement between Meadors and CSP suggests that the payments from CSP to Meadors are compensation for services rendered by Meadors to *ADA*, rather than to *CSP*.  To the contrary, the agreement makes reference to sales by CSP to accounts other than ADA.  In short, under its agreement with CSP, Meadors was being paid for finding CSP customers, not for finding ADA suppliers.[8]  Accordingly, ADA's direct relationship with Meadors is inapposite to the breach of contract claims Meadors raises against CSP.[9]

## 2.   CSP's Right to Terminate Meadors's Agency

Although ADA's ability to terminate Meadors's agreement has no direct impact on Meadors's separate and independent agreement with CSP, that ability suggests a somewhat different approach

---

[8] I recognize that in its subsequent letter to Meadors, in which CSP confirmed that Mr. Murtha had sufficient authority to enter an agreement on behalf of CSP, CSP referred to Meadors as ADA's agent.  "[CSP] recognize[s] Chuck Meadors as the acting agent for [ADA] with a five percent (5%) commission fee on all sales of molded parts and and [sic] SMC compound commercially."  This letter does not purport to alter the previous agreement, nor is there evidence that Meadors agreed to any such modification.

[9] I note, however, that ADA could presumably pursue Meadors for any payments made by CSP to Meadors, as this is arguably a breach of the agreement between ADA and Meadors for which such payments are essentially the measure of damages.

for CSP in pursuing its summary judgment argument.  The
agreement between CSP and Meadors makes Meadors an agent of CSP.
It provides that Meadors is to receive commission payments on
CSP's sales, not only to ADA but also to other purchasers.  In
the October 2005 letter from Mr. Murtha to Meadors following the
initial September 2005 agreement, Meadors is actually identified
as CSP's agent.  Accordingly, as described above, CSP had the
right to terminate Meadors and end their principal-agent
relationship at any time, subject to limited exceptions.

One potentially applicable exception to the implications of
Meadors's at-will status is Ohio's "procuring cause" doctrine.
Under that doctrine, a broker or agent seeking to collect a
commission "must show that he was the 'procuring cause' of the
sale." *Bauman* v. *Worley*, 143 N.E.2d 820, 822 (Ohio 1957).  "The
term 'procuring cause'," as defined in the context of the work
of a real estate broker, "refers to a cause *originating* a series
of events which, without break in their continuity, result in
accomplishment of the prime objective of employment of the
broker — producing a purchaser ready, willing and able to buy
real estate on the owner's terms."  *Id.* (internal citation marks
omitted; emphasis in original).

The procuring cause doctrine is limited, however, "to the
acquisition of *particular orders* by the agent, *not customers*."
*Davis & Tatera,* 796 F. Supp. at 1084 (emphasis added).  Indeed,

"the successful negotiation of a contract by an agent does not give him a right to commissions on renewal, which he does not secure, in the absence of an express contract to that effect." *Id.* (quoting *Wood* v. *Hutchinson Coal Co.*, 176 F.2d 682, 684 (4th Cir. 1949)). Plainly, the doctrine does not extend to circumstances in which an agent seeks to obtain commission payments for sales resulting from an ongoing relationship between buyer and seller that continues after a reformation of the agent's agreement with the buyer to make explicit that the agent may not receive compensation form the seller. *See Davis & Tatera*, 796 F. Supp. at 1084. The fact of the agency, and Meadors's introduction of ADA to CSP, therefore does not entitle Meadors to ongoing commission payments from CSP for purchases made by ADA under the procuring cause doctrine after the reformation of the agreement between ADA and Meadors.

Another potential exception to the general principle of at-will termination, however, is applicable. Following a 1953 decision of an Ohio court of appeals, *Smith* v. *Frank R. Schoner, Inc.*, 115 N.E.2d 25, 27-28 (Ohio Ct. App. 1953),[10] federal courts applying Ohio law have imposed a duty of good faith in the

---

[10] In *Smith*, an Ohio court of appeals recognized a duty of good faith in the termination of an agency relationship by the principal, and specifically noted that terminating an agency relationship in order "to escape the payment of a broker's commission" constitutes bad faith. *See Smith* v. *Frank R. Schoner, Inc.*, 115 N.E.2d 25, 27-28 (Ohio Ct. App. 1953).

termination of an agency relationship by the principal, and have
characterized termination that is intended to avoid paying a
commission due as constituting bad faith. *See Davis & Tutera*,
796 F. Supp. at 1087 (citing and discussing *Randolph* v. *New Eng.
Mut. Life Ins. Co.*, 526 F.2d 1381, 1387 (6th Cir. 1975), and
*Northwest Fin. Agency, Inc.* v. *Transamerica Occidental Life Ins.
Co.*, 773 F. Supp. 75, 81 (S.D. Ohio 1991)). Although these
federal courts have acknowledged that the Supreme Court of Ohio
has not explicitly recognized such a duty, and indeed that
several unpublished decisions of the Ohio courts of appeals have
concluded that "a principal owes no duty of good faith in the
termination of an agency relationship," *see Davis & Tatera,
Inc.*, 796 F. Supp. at 1087 (collecting appellate cases), there
appears to be some consensus that "Ohio courts, and courts
applying Ohio law, have recognized a claim for the bad-faith
termination of an agency agreement" particularly with regard to
termination to avoid payment of a commission. *See Vance* v.
*Cargill, Inc.*, No. 2:07-cv-173, 2007 WL 1192359, at *3 (S.D.
Ohio Apr. 23, 2007); *see also Apex Sales Agency, Inc.* v. *Mather
Co.*, No. 60344, 1992 WL 354816, at *10 (Ohio Ct. App. Nov. 19,
1992) (following *Smith* and noting that this principle does not
extend to employment contracts). *But see Gen. Motors Corp.* v.
*Mahoning Valley Sanitary Dist.*, 780 F.2d 1021, at *6 (6th Cir.
1985) (table decision) (observing – while interpreting oil and

gas lease - that *Randolph* court "r[a]n great risks in attempting to predict the future course of state law which is as yet undecided" by following *Smith* without clear guidance from Supreme Court of Ohio).

If Ohio were to recognize a good faith exception, Meadors has adduced evidence that CSP violated its promises not to approach ADA, and that it did so with the specific plan to reduce its costs by cutting out Meadors's commissions. Furthermore, this occurred prior to the actual termination of Meadors as CSP's agent.  For purposes of summary judgment, this would be sufficient to create a genuine issue of material fact as to whether CSP's termination of Meadors was in good faith or was instead undertaken with the intention of depriving Meadors of rightfully due commission payments.  However, I need not decide whether to join those courts in recognizing a limited good faith exception under Ohio law in these circumstances, since I conclude, as will be discussed below, that Meadors essentially abandoned its claim for commission payments against CSP.

## D.    *Waiver or Novation of the Agreement with CSP*

CSP contends that its obligations under its agreement with Meadors were excused because Meadors has either waived receipt of its commission payments from CSP or because the parties have undertaken a novation which replaces that agreement and which

does not require payment from CSP to Meadors.  Meadors's

agreement to continue receiving commission payments from ADA but

to cease receiving such payments from CSP was an agreement it

made with ADA, not with CSP.  Accordingly, CSP is not a party to

that agreement, and may not seek to enforce it unless CSP can

establish that it was an intended third-party beneficiary of

that contractual action between ADA and Meadors.

Ohio courts recognize the rights of third-party

beneficiaries and the duties owed to them in that capacity where

there is an "intent to benefit" the third party.  *Hill* v.

*Sonitrol of Sw. Ohio, Inc.*, 521 N.E.2d 780, 784-85 (Ohio 1988).

Under the "intent to benefit" analysis:

> [I]f the promisee . . . intends that a third party
> should benefit from the contract, then that third party
> is an "intended beneficiary" who has enforceable rights
> under the contract.  If the promise has no intent to
> benefit a third party, then any third-party beneficiary
> to the contract is merely an "incidental beneficiary,"
> who has no enforceable rights under the contract. . . .
> [T]he mere conferring of some benefit on the supposed
> beneficiary by the performance of a particular promise
> in a contract [is] insufficient; rather, the performance
> of that promise must also satisfy a duty owed by the
> promisee to the beneficiary.

*Id.* (quoting *Norfolk & W. Co.* v. *United States*, 641 F.2d 1201,

1208 (6th Cir. 1980) (alterations in original)).

The agreement between Meadors and ADA, following Mr.

Flaherty's ultimatum, is clearly calculated to benefit CSP and,

correspondingly, ADA.  Meadors agreed with ADA that it would

cease collecting commission payments from CSP.  This agreement
followed a conversation between ADA and CSP in which they sought
to minimize the costs of doing business together.  Although an
assessment of the intent to benefit typically relies solely on
the language of the agreement itself, extrinsic evidence such as
the content and goals of the June 2006 meeting between CSP and
ADA may be considered "when the circumstances surrounding the
agreement invest the language of the contract with a special
meaning."  *Huff* v. *FirstEnergy Corp.*, 957 N.E.2d 3, 7 (Ohio
2011) (quoting *Shifrin* v. *Forest City Enters., Inc.*, 597 N.E.2d
499, 500 (Ohio 1992)).  Without having to pay Meadors's
commission, CSP would be able to turn a greater profit on its
sales to ADA or lower its pricing for ADA, thereby making more
sales.  CSP, then, stood to obtain "the benefit of the promised
performance" by Meadors, and this benefit was clearly
contemplated by ADA in seeking to obtain this performance by
Meadors.  *See Hill*, 521 N.E.2d at 784 (adopting Section 302 of
the Restatement of the Law 2d, Contracts (1981), which defines
an intended beneficiary as one who "the circumstances indicate
that the promisee intends to give . . . the benefit of the
promised performance").  Accordingly, CSP may enforce that
agreement as a third-party beneficiary, and may pursue its
arguments of waiver and novation.  *See Grant Thornton* v. *Windsor
House, Inc.*, 566 N.E.2d 1220, 1223 (Ohio 1991).

Under Ohio law, waiver is defined as a "voluntary relinquishment of a known right." *Chubb* v. *Ohio Bureau of Workers' Comp.*, 690 N.E.2d 1267, 1269 (Ohio 1998). It "is generally applicable to all personal rights and privileges, whether contractual, statutory, or constitutional." *Glidden*, 861 N.E.2d at 118. "[T]he holder of the privilege is the only one who has the power to relinquish it." *State ex rel. Wallace* v. *State Med. Bd. of Ohio*, 732 N.E.2d 960, 965 (Ohio 2000).

Meadors contends that, rather than voluntarily waiving its commissions, it was presented with an ultimatum by ADA: either relinquish the right to commissions from CSP or cease doing business with ADA. To Meadors, this was a Hobson's choice. Meadors either could continue working with ADA and receive payment from ADA, or continue under the agreement with CSP, but risk a potential rupture in the business relationship with ADA which formed the basis for any anticipated compensation from CSP. Faced with this "choice," Meadors decided to continue receiving payments from ADA, at the expense of effectively waiving its rights to a commission under its agreement with CSP.

Mr. Flaherty's requirement that Meadors cease receiving payments from either ADA or CSP presented Meadors with a difficult choice, but not one which was unlawfully coercive. ADA had the right to terminate its agency agreement with Meadors; it also had the right to place conditions on the

continuation of Meadors's relationship with ADA, including the condition that Meadors not receive a commission from CSP. In effect, this was simply terminating the current arrangement between ADA and CSP and entering a new one with an added condition – this had the added effect, however, of requiring Meadors to relinquish the rights afforded to it under its agreement with CSP. *Cf. Sweeney* v. *Grange Mut. Cas. Co.*, 766 N.E.2d 212, 216 (Ohio Ct. App. 2001) ("it is a basic principle of contract law that a party to a contract who would benefit from a condition precedent to its performance may waive that condition"). Meadors took the option that it viewed as most beneficial and did so knowingly and voluntarily. And Meadors continued to perform after making this decision in June 2006.

This knowing and voluntary choice is sufficient to effect a waiver of the right to continue to receive commission payments from CSP. *See CosmetiCredit, L.L.C.* v. *World Fin. Network Nat'l Bank*, 24 N.E.3d 762, 772 (Ohio Ct. App. 2014) (waiver of certain contractual duties, either by word or action, must be made through "clear, unequivocal, and decisive act to waive"). Thus, even if CSP breached its obligation by approaching ADA directly or by seeking in bad faith to deprive Meadors of its commissions, Meadors voluntarily relinquished its right to the contractual benefits it was owed by CSP. *See id.* ("other parties who change their position as a result of the waiver may

enforce the waiver" (citing *Andrews* v. *Ohio State Teachers Retirement Sys.*, 404 N.E.2d 747 (Ohio 1980)); *cf. Hounshell* v. *Am. States Ins. Co.*, 424 N.E.2d 311, 313 (Ohio 1981). Meadors did so in order to facilitate its ongoing business relationship with ADA, which it viewed as more valuable. This was a voluntary and intentional waiver of Meadors's contractual rights, and excuses CSP's performance.[11]

Accordingly, I will grant summary judgment for CSP on the claims by Meadors for breach of contract against CSP and breach of Ohio Rev. Code § 1335.11.[12]

## VI. MEADORS'S CLAIMS AGAINST ADA

Meadors has asserted claims against ADA for (1) breach of a joint venture agreement; (2) tortious interference with contract; (3) breach of contract by ADA in connection with the Jefferson, Ohio facility; (4) breach of contract by ADA in connection with services performed by Meadors; (5) unjust enrichment; and (6) promissory estoppel. Although Meadors moves

---

[11] Because I conclude that Meadors waived its commission, I need not assess whether the parties undertook a novation that replaces the earlier agreement and does not require CSP to pay Meadors.

[12] Ohio Revised Code § 1335.11 permits an aggrieved sales representative to recover unpaid commissions from a principal, as well as treble damages if the failure to pay was "willful, wanton, or reckless misconduct or bad faith." A statutory claim for breach of contract – which § 1335.11 essentially provides – is subject to waiver just as a common law claim is. *See Glidden Co.* v. *Lumbermens Mut. Cas. Co.*, 861 N.E.2d 109, 118 (Ohio 2006).

for summary judgment on only some of these claims, ADA seeks summary judgment on all of Meadors's claims against it.[13]

Meadors's claims are based on three factual predicates. The first is that ADA owes Meadors for work performed under the supplier agreements pursuant to which Meadors performed light manufacturing and other services ancillary to the delivery of tiles from CSP and Zehrco-Giancola to ADA. The second is that ADA wrongfully took possession of Meadors's property when it assumed control of the Jefferson, Ohio facility. The third is that ADA is obligated to repay Meadors for the costs that Meadors incurred setting up the Jefferson facility.

## A. *Breach of Contract: Meadors's Unpaid Invoices*

Meadors attaches to its motion for summary judgment invoices for services performed by Meadors pursuant to the September 2005 agreement. Under that agreement, ADA was obligated to pay Meadors on a per-piece basis for the secondary manufacturing activities performed by Meadors. Meadors claims that, in addition to terminating the agreement in March 2012, ADA has refused to pay the invoices for past performance, which total $154,388.50.

---

[13] Meadors appears to have abandoned its claim for tortious interference with contractual relations against ADA. This is understandable in light of its agreement to rearrange its agreement with ADA. Given the lack of argument by Meadors in opposition to summary judgment sought by ADA, I will grant summary judgment to ADA as to the claim of tortious interference with contractual relations.

ADA appears not to contend — or at least has not produced evidence — that Meadors failed to perform the work indicated on the invoices or that ADA has paid for that work.  Rather, ADA argues that Meadors has failed to demonstrate any damages from the breach of contract.  The apparent basis for this argument is that, after being terminated by ADA, Meadors no longer was accruing expenses associated with its light manufacturing activities and that ADA, when it assumed control of the Jefferson facility, also assumed responsibility for the associated expenses of the manufacturing activities taking place there.  According to ADA, because there was no longer any outflow from Meadors's expenses, Meadors cannot demonstrate its damages and thus its claim for a breach of contract fails.

This argument does not pass muster.  Meadors claims to be owed more than $154,388.50.  A loss of that amount of money constitutes damages — money that Meadors would have received if ADA had performed its contractual obligations.  *See John Hetherington & Sons* v. *William Firth Co.*, 95 N.E. 961, 964 (Mass. 1911); *Schulke Radio Prods., Ltd.* v. *Midwestern Broad. Co.*, 453 N.E.2d 683, 686 (Ohio 1983).  The fact that Meadors's ongoing and future expenses may be reduced is immaterial.  The damages resulting from ADA's alleged nonperformance are that Meadors does not have $154,388.50 that it would have had if ADA had performed.

ADA's second argument is slightly more colorable. Scott Ober, ADA's vice president, testified that ADA did not pay Meadors's invoices because Meadors itself breached the agreement. Specifically, Mr. Ober testified that he believed Meadors was stealing from ADA by receiving kickbacks from ADA suppliers.

It is black letter law that "[a] material breach by one party excuses the other party from further performance under the contract." *Teragram Corp.* v. *Marketwatch.com, Inc.*, 444 F.3d 1, 11 (1st Cir. 2006) (quoting *Lease-It, Inc.* v. *Mass. Port Auth.*, 600 N.E.2d 599, 602 (Mass. App. Ct. 1992)); *see Transp. Ins. Co.* v. *Busy Beaver Bldg. Ctrs., Inc.*, 969 F. Supp. 2d 875, 889 (S.D. Ohio 2013) (citing *Freeman Indus. Prods.* v. *Armor Metal Group*, 952 N.E.2d 543, 552 (Ohio Ct. App. 2011). A material breach occurs when one party fails to perform "an essential and inducing feature of the contract[ ]." *Lease-It*, 600 N.E.2d at 602 (citation omitted; alteration in original); *see Marion Family YMCA* v. *Hensel*, 897 N.E.2d 184, 186 (Ohio Ct. App. 2008) ("A 'material breach of contract' is a failure to do something that is so fundamental to a contract that the failure to perform defeats the essential purpose of the contract or makes it impossible for the other party to perform.").

The argument that Meadors's purported breach of contract excused ADA's performance has force only if Meadors did indeed

commit some breach.  Taking unauthorized commission payments
from ADA's suppliers — while ostensibly working as a fiduciary
on ADA's behalf — would undoubtedly constitute a breach of
contract as well as a violation of the fiduciary duty owed by
Meadors as an agent to ADA.  Meadors, however, denies that the
commission payments from CSP were unauthorized.  To the
contrary, Meadors contends that it was directed by Mr. Flaherty
to receive such payments.  Meadors also contends that it did not
receive commission payments at all from Zehrco-Giancola.
Rather, Meadors claims to have received the repayment of its
equity investment in the company from Zehrco-Giancola, which was
repackaged as a commission only so that it could be deducted as
business expenses and reduce Zehrco-Giancola's tax liability.[14]

There is no conclusive evidence on either side that would
lead a reasonable fact-finder to draw only one conclusion.
Resolution of these issues depends on credibility determinations
concerning Mr. Meadors, Mr. Ober, Mr. Flaherty, and Mr.
Giancola.  This is not something that I may do on summary
judgment.  *See Reeves* v. *Sanderson Plumbing Prods., Inc.*, 530

---

[14] Mischaracterizing a transaction for tax-avoidance purposes
obviously raises serious ethical and legal concerns.  If,
however, as Meadors contends, the payments relate solely to a
transaction between Meadors and Zehrco-Giancolas, they do not
implicate Meadors's duties to ADA or constitute a breach and an
excuse for ADA's subsequent non-performance.

U.S. 133, 150 (2000) (in reviewing motion for judgment as a matter of law, court "may not make credibility determinations").

Whether ADA has breached its contract with Meadors by failing to pay invoices for past due performance depends upon contested issues of fact. Therefore, summary judgment on these claims in favor of either party is inappropriate.

## B. *Breach of Contract and Unjust Enrichment: Jefferson, Ohio Facility*

Meadors seeks damages for what it views as an unauthorized lock-out from the Jefferson, Ohio facility. This claim is based primarily upon the statement in the October 13, 2011 agreement that ADA "has agreed that [Meadors] will occupy said facility rent-free after acquisition."

Meadors contends that this agreement entitles it to occupy the Jefferson facility in perpetuity. Mr. Meadors testifies that he understood the agreement to amount to a life-long, rent-free lease. ADA, in response, contends that the term of the agreement is limited to the duration of the principal-agent relationship between ADA and Meadors, pointing in particular the language in the October 13, 2011 agreement that "Agent [Meadors] and Principal [ADA] are currently engaged in a relationship where Agent is the sole and exclusive Agent for the Principal's Ohio satellite operation."

As ADA correctly observes, perpetual leases are disfavored under Ohio law, but they are not per se illegal. *See Myers* v. *East Ohio Gas*, 364 N.E.2d 1369, 1373 (Ohio 1977); *Hallock* v. *Kintzler*, 51 N.E.2d 905, 906 (Ohio 1943). As a result, "the intention to create [a perpetual lease] must appear in clear and unequivocal language, and accordingly, a lease will not be construed to create a right to perpetual renewal unless the language employed clearly and unambiguously indicates that it was the intention and purpose of the parties to do so." *Hallock*, 51 N.E.2d at 906. The Jefferson facility agreement, which specifies no duration, fails to satisfy this test.[15]

Absent a specification of the duration of the tenancy, a lease agreement typically creates a periodic tenancy with the period determined by the frequency of rental payments. *See, e.g., Haught* v. *Geissinger*, No. CA2008-03-010, 2009 WL 57620, at *3 (Ohio App. Ct. Jan. 12, 2009). Where, as here, no rental payments are made, however, a tenancy at will is created. *See Manifold* v. *Schuster*, 586 N.E.2d 1142, 1145 (Ohio App. Ct. 1990) ("The law provides that a tenancy at will is created when

---

[15] In addition, any subsequent oral promises regarding a tenancy for life, as Meadors contends were made by Mr. Flaherty, fail to satisfy Ohio's statute of frauds. *See* Ohio Rev. Code § 1335.04 ("No lease, estate, or interest, either of freehold or term of years, or any uncertain interest of, in, or out of lands, tenements, or hereditaments, shall be assigned or granted except by deed, or note in writing, signed by the party assigning or granting it, or his agent thereunto lawfully authorized, by writing, or by act and operation of law.").

possession of the premises is taken under an invalid lease . . . Upon payment and acceptance of rent, this tenancy at will then converts to a periodic tenancy."). A tenancy at will is terminable at the will of either the landlord or the tenant. *BeWigged by Suzzi, Inc.* v. *Atlantic Dept. Stores, Inc.*, 359 N.E.2d 721, 726 (Ohio App. Ct. 1976); *see Myers*, 364 N.E.2d at 1372 ("The characteristics of a tenancy at will . . . are 'uncertainty respecting duration and the right of either party to terminate it by proper notice.'" (citation omitted)). As the landlord and owner of the Jefferson facility, and absent either a valid lease specifying a duration of the tenancy or payments creating a periodic tenancy, ADA was within its rights to terminate the Meadors's occupancy at any time.

That the occupancy was terminable at will, however, does not foreclose all of Meadors's claims regarding the Jefferson facility. Meadors also asserts a claim of unjust enrichment. It contends that Meadors moved its light manufacturing equipment and operations into the Jefferson facility at the behest of Mr. Flaherty, who used the business relationship between ADA and Meadors to investigate Meadors's operations and finances. When Mr. Meadors traveled on business to Texas — also at ADA's behest — Mr. Flaherty and Mr. Ober changed the locks on the Jefferson facility, in the process seizing Meadors's equipment, inventory, and records.

"Unjust enrichment occurs when a person 'has and retains money or benefits which in justice and equity belong to another.'" *Johnson* v. *Microsoft Corp.*, 834 N.E.2d 791, 799 (Ohio 2005) (quoting *Hummel* v. *Hummel*, 14 N.E.2d 923 (Ohio 1938)). Here, by locking Meadors out of the Jefferson facility, ADA took possession of Meadors's business, including records, equipment, and inventory (at least according to Mr. Meadors), potentially without justification. This is sufficient to establish a claim for unjust enrichment. Accordingly, Meadors's claim of unjust enrichment as to the Jefferson facility survives summary judgment.

## C.     *Breach of a Joint Venture Agreement*

To establish a joint venture under the law of either Ohio or Massachusetts, a party must demonstrate some degree of common interest in the purpose of the venture, shared and common control, and sharing in the profits. *See Siegel* v. *LifeCenter Organ Donor Network*, 969 N.E.2d 1271, 1279 (Ohio App. Ct. 2011) ("Among other requirements, a joint venture does not exist unless the parties share in profits and losses and have an equal right to direct each others' conduct."); *see also Petricca Dev. Ltd. P'ship* v. *Pioneer Dev. Co.*, 214 F.3d 216, 220 (1st Cir. 2000) ("Under Massachusetts law, the existence of a joint venture is entirely dependent upon the parties' intent," as evidenced by contribution to a common undertaking, "a right to

participate in the control or management of the enterprise, "a right to share in profits," and other indicia (quoting *Shain Inv. Co.* v. *Cohen*, 443 N.E.2d 126, 130 (Mass. App. Ct. 1982)).

Meadors has not demonstrated any of the necessary elements of a joint venture. Rather than involving itself in common control, ADA was the principal and Meadors an agent; the latter is subject to the control by the former, rather than sharing common control. Similarly, rather than sharing in profits and losses, Meadors was to be compensated on a per-piece basis for its work as provided for in the supplier agreements. There is simply no factual basis for the conclusion that there exists or existed a joint venture between Meadors and ADA.

## D. *Promissory Estoppel*

A claim of promissory estoppel requires proof of a definite and unambiguous promise that is sufficient to induce a reasonable person to act. *See MMK Group, LLC* v. *SheShells Co., LLC*, 591 F. Supp. 2d 944, 963-64 (N.D. Ohio 2008) ("To establish a claim of promissory estoppel, [a party] must show: (1) a promise, clear and unambiguous in its terms; (2) reliance on the promise by the party to whom the promise is made; (3) that the reliance was reasonable and foreseeable; and (4) [the party was] were injured by the reliance.") (citing *McCroskey* v. *State*, 456 N.E.2d 1204, 1205 (Ohio 1983)); *Shampton* v. *Springboro*, 786 N.E.2d 883, 887 (Ohio 2003); *see also R.I. Hosp. Trust Nat'l*

*Bank* v. *Varadian*, 647 N.E.2d 1174, 1178 (Mass. 1995) ("An essential element under the promissory estoppel theory is that there be an unambiguous promise and that the party to whom the promise was made reasonably relied on the representation." (internal quotation marks and citation omitted)).

Meadors has failed to set forth evidence of a promise made by ADA — other than those promises set forth in the contractual agreements entered into between the parties — sufficiently definite to satisfy the requirements of promissory estoppel. Indeed, as Meadors explains, Meadors predicates its claim that ADA promised it use of the Jefferson facility upon the October 2011 agreement, which Meadors erroneously argues grants it a perpetual lease to the property. Because ADA did not make the definite and unambiguous promise Meadors claims it did, Meadors's promissory estoppel claim fails.

## E. *Summary*

In sum, I will grant summary judgment in favor of ADA on Meadors's claims for tortious interference with contract (which appears to be unopposed); breach of contract insofar as it relates to the Jefferson, Ohio facility; breach of a joint venture agreement; and promissory estoppel. I will deny ADA's request for summary judgment and Meadors's request for summary judgment on Meadors's claims for breach of contract as it

relates to unpaid invoices for work performed by Meadors and for unjust enrichment as it relates to the Jefferson, Ohio facility.

## VII. ADA'S CLAIMS AGAINST MEADORS

ADA asserts five separate counts against Meadors: (1) breach of contract; (2) breach of fiduciary duty; (3) conversion; (4) fraud; and (5) violation of Mass. Gen. Laws ch. 93, § 11. These claims and the relevant factual disputes are largely the converse of those presented by Meadors.[16]

### A.   *Breach of Contract and Breach of Fiduciary Duty*

As described above, Meadors received commission payments from CSP on CSP's sales of tactile tiles to ADA from October 2005 until June 2006, the period during which it was acting as an agent of ADA pursuant to the August 2005 supplier agreement. While Meadors claims that the CSP commission payments were

_____

[16] ADA moved for summary judgment in its favor on these claims, but Meadors declined to do so. Instead, after the completion of summary judgment briefing, Meadors filed a belated motion for judgment on the pleadings. Although it is untimely, I have considered the arguments proffered by Meadors under the standards applicable to a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. *See* Fed. R. Civ. P. 12(d) (if "matters outside the pleadings are presented and not excluded by the court, the motion [for judgment on the pleadings] must be treated as one for summary judgment"); *see also Rubert-Torres* v. *Hosp. San Pablo, Inc.*, 205 F.3d 472, 475 (1st Cir. 2000) ("Conversion of a motion for judgment on the pleadings into one for summary judgment . . . [may] occur after the parties have been offered a 'reasonable opportunity' to present pertinent summary judgment materials."). As set forth below, however, I find the substance of the arguments for judgment in Meadors's favor to be without merit and so reject them.

authorized by ADA, ADA denies this.  Similarly, Meadors claims
the payments it received from Zehrco-Giancola represent
repayment of the investment Meadors made in Zehrco before it was
acquired by the Giancola family.  Though referenced in the
agreement with Zehrco-Giancola as "commissions," they were,
according to Meadors, actually payments for Meadors's stake in
the company.  Mr. Giancola flatly denies this, stating that the
characterization of the payments as commissions was in fact
correct.

If these factual disputes are resolved contrary to
Meadors's contention, the receipt of these payments clearly
establishes a breach of contract and breach of fiduciary duty.
In his agreements with ADA, Meadors promised to act as an agent
on behalf of ADA.  Even more specifically, Meadors, in the April
2006 agreement, promised that it would not "participate or
invest in, or otherwise be involved . . . in any business
organization or person which is a customer or potential
customer, or supplier or potential supplier, of ADA . . ."
Accepting commissions from ADA's suppliers without ADA's
authorization — if that is, in fact what occurred — clearly
constitutes a breach of these contractual duties, as well as a
breach of the fiduciary duty of loyalty owed by an agent to a
principal.  *See* Restatement (Third) of Agency §§ 8.02, 8.04,
8.07 (2006).  By accepting money from ADA's counterparty and

customer, Meadors inflated the costs of ADA's goods and placed its own interest above that of his principal.  This would be both a breach of contract and of fiduciary duty if the principal did not authorize or acquiesce in the arrangement.  *See* Restatement (Third) of Agency § 8.06 (2006); *cf. Gagnon* v. *Coombs*, 654 N.E.2d 54, 62 (Mass. App. Ct. 1995).

As with Meadors's breach of contract claim regarding the unpaid invoices, resolution of this issue depends on credibility determinations that may not be made at the summary judgment stage. Whether Meadors breached its contract with and fiduciary duties to ADA depends on contested issues of fact.  Accordingly, I will not grant summary judgment on ADA's breach of contract and breach of fiduciary duty claims.

**B.   *Conversion or Fraud***

It is a somewhat closer question whether these acts also would constitute conversion or fraud.

Under Massachusetts law, the "elements of conversion may be established by a showing that one person exercised dominion over the personal property of another, without right, and thereby deprived the rightful owner of its use and enjoyment."  *In re Hilson*, 863 N.E.2d 483, 491 (Mass. 2007).  Similarly, under Ohio law, "[t]he elements of a conversion claim are: 1) plaintiff's ownership or right to possession of the property at the time of the conversion; 2) defendant's conversion by a wrongful act or

disposition of plaintiff's property rights; and 3) damages."
*NPF IV, Inc.* v. *Transitional Health Servs.*, 922 F. Supp. 77, 81
(S.D. Ohio 1996).

By accepting what can potentially be characterized as
kickbacks from ADA's customers, Meadors could be said to be
pocketing rebates on purchases that rightfully should have
belonged to and benefitted ADA. At the summary judgment stage,
this is sufficient to allow a claim for conversion to proceed.

I reach a similar conclusion regarding the fraud claim.
Under Massachusetts law, a claim of fraud requires proof that
the opposing party "made a false representation of a material
fact with knowledge of its falsity for the purpose of inducing
the [claimant] to act thereon, and that the [claimant] relied
upon the representation as true and acted upon it to [its]
damage." *Sahin* v. *Sahin*, 758 N.E.2d 132, 138 n.9 (Mass. 2001)
(citations omitted). "Fraud by omission requires both
concealment of material information and a duty requiring
disclosure." *Id.* Similarly, under Ohio law, a claim of fraud
requires: "(a) a representation or, where there is a duty to
disclose, concealment of a fact, (b) which is material to the
transaction at hand, (c) made falsely, with knowledge of its
falsity, or with such utter disregard and recklessness as to
whether it is true or false that knowledge may be inferred, (d)
with the intent of misleading another into relying upon it, (e)

48

justifiable reliance upon that representation or concealment, and (f) a resulting injury proximately caused by the reliance." *Burr* v. *Bd. of County Comm'rs of Stark Cty.*, 491 N.E.2d 1101, 1105 (Ohio 1986) (internal quotation marks omitted) (quoting *Cohen* v. *Lamko, Inc.*, 462 N.E.2d 407 (Ohio 1984).

As an agent of ADA, Meadors was obligated to disclose to its principal material facts within the scope of its agency. The evidence of record could support the finding that, rather than do so, Meadors entered into renewed agreements with ADA, while at the same time collecting commissions from CSP and Zehrco-Giancola — customers of ADA.  These are facts material to Meadors's representation of ADA and which call into question Meadors's loyalty as an agent.  Meadors's failure to disclose these facts to ADA, while not only continuing to act as an agent, but also entering into a new agreement — the April 2007 supplier agreement — may be found sufficient to constitute fraud.  Because a reasonable fact-finder could resolve these factual disputes in favor of either ADA or Meadors, summary judgment is inappropriate.

## C.   *Violation of Massachusetts General Laws Chapter 93A*

Massachusetts General Laws Chapter 93A, § 11, makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  However, "a mere breach of contract, without more

does not constitute an unfair or deceptive act or practice."
*Incase, Inc.* v. *Timex Corp.*, 421 F. Supp. 2d 226, 239 (D. Mass.
2006) (internal quotation marks and citations omitted); *see also*
*Spence* v. *Berkshire Life Ins. Co.*, 561 F. Supp. 2d 126, 130-31
(D. Mass. 2008) (good faith dispute regarding meaning of
contract does not rise to level of 93A violation).

Meadors does not press for summary judgment on the
substantive merits of the 93A claim (which, like the remaining
claims, hinges on disputed facts), but instead contends at this
stage that the facts giving rise to the claim occurred primarily
in Ohio, rather than Massachusetts, precluding application of
Chapter 93A.

Chapter 93A, § 11 applies only to transactions and conduct
that occurred "primarily and substantially" within
Massachusetts. "[T]he burden of proof shall be upon the person
claiming that such transactions and actions did not occur
primarily and substantially within the commonwealth." Mass.
Gen. Laws ch. 93A, § 11. In determining whether Chapter 93A
applies "a judge should . . . determine whether the center of
gravity of the circumstances that give rise to the [§ 11] claim
is primarily and substantially within the Commonwealth."
*Kuwaiti Danish Computer Co.* v. *Digital Equip. Corp.*, 781 N.E.2d
787, 797-99 (Mass. 2003). This determination is not one which
"can be reduced to any precise formula"; it requires a fact

intensive inquiry "unique to each case." *Id.* at 798. In assessing the locus of the conduct, the inquiry is limited to that conduct which is said to give rise to the violation. *See id.* at 798.

Much of the activity underlying ADA's claim occurred in Ohio. Meadors operated out of Ohio throughout this time period, and the August 2005 agency authorization specifically limited Meadors's agency to suppliers in Ohio and ADA's operations in Ohio. The place of the unfair or deceptive conduct is only one consideration in the calculus, however. *See Kuwaiti*, 781 N.E.2d at 798 n.13.

The connection to Massachusetts is not significant. Meadors's agency related to the production of tactile tiles for delivery to ADA in Massachusetts. The pecuniary harm arising from any violation, were one to be proven, would therefore also be felt in Massachusetts. *See Auto Shine Car Wash Sys., Inc.* v. *Nice 'N Clean Car Wash, Inc.*, 792 N.E.2d 682, 685-86 (Mass. App. Ct. 2003); *see also KPS & Assocs., Inc.* v. *Designs by FMC, Inc.*, 318 F.3d 1, 24 (1st Cir. 2003) (considering "where the plaintiff was on the receiving end of the unfair or unscrupulous conduct" and "the situs of plaintiff's losses due to the unfair and unscrupulous conduct"). ADA is a resident of Massachusetts, and at least some of the discussions giving rise to the transactions at issue occurred in Massachusetts. These considerations

suggest some nexus between Massachusetts and the challenged conduct.

Ultimately, however, the only connection to Massachusetts is that it is where the aggrieved party (ADA) is based and where it may have suffered harm.  This is insufficient, under these circumstances, to render Massachusetts the "center of gravity" of the allegedly unfair conduct.  *See Spring Investor Servs., Inc*. v. *Carrington Capital Mgmt., LLC*, Civ. Action No. 10-10166-FDS, 2013 WL 1703890, at *13 (D. Mass. Apr. 18, 2013) ("As many courts have previously held, a place of injury within Massachusetts is not a sufficient basis for finding that conduct occurred 'primarily and substantially' within the Commonwealth.").  Even read in the light most favorable to Meadors, I conclude the evidence demonstrates at best that "the significant contacts of the competing jurisdictions are approximately in the balance." *Uncle Henry's Inc*. v. *Plaut Consulting Co.*, 399 F.3d 33, 44 (1st Cir. 2005).  For this reason, "the conduct in question cannot be said to have occurred primarily and substantially in Massachusetts." *Id*.  Accordingly, I will grant summary judgment for Meadors on ADA's Chapter 93A claim.

## VIII. CONCLUSION

For the reasons set forth more fully above, CSP's motion for summary judgment [Dkt. Entry No. 66] is GRANTED.

ADA's motion for summary judgment [Dkt. Entry No. 64] is GRANTED in part as to counts 2, 3, 4, and 7 of Meadors's First Amended Complaint (in the Ohio action) and counts 1, 2, 3, and 6 of Meadors's counterclaims in response to ADA's Complaint (in the Massachusetts action), pertaining to breach of a joint venture agreement, tortious interference, breach of contract regarding the Jefferson, Ohio facility, and promissory estoppel. The remainder of ADA's motion for summary judgment is DENIED.

Meadors's motion for summary judgment against CSP [Dkt. Entry No. 54] is DENIED. Meadors's motion for partial summary judgment against ADA [Dkt. Entry No. 57] is GRANTED in part as to count 5 of ADA's Complaint and counterclaim (the Chapter 93A claim). The remainder of Meadors's motion for summary judgment is DENIED.

Meadors's motion for judgment on the pleadings [Dkt. Entry No. 93] is DENIED.

What remains are Meadors's claims of breach of contract for services rendered and for unjust enrichment regarding the Jefferson, Ohio facility against ADA, and all of ADA's claims against Meadors except the Chapter 93A claim.


*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE